**Slip Op. 09-53**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **ATAR, S.r.l.,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**AMERICAN ITALIAN PASTA CO., DAKOTA GROWERS PASTA CO., AND NEW WORLD PASTA CO.,**<br><br>Defendant-Intervenors. | **Before: Timothy C. Stanceu, Judge**<br><br>**Court No. 07-00086**<br><br>**PUBLIC**[*] |

**OPINION AND ORDER**

[Affirming in part, and remanding in part, the final results issued by the United States Department of Commerce in an administrative review of an antidumping duty order on certain pasta from Italy]

Dated: June 5, 2009

*Riggle & Craven* (*David J. Craven*) for plaintiff.

*Tony West,* Assistant Attorney General, *Jeanne E. Davidson,* Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Jane C. Dempsey*); *Deborah King,* Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*Kelley Drye & Warren, LLP* (*David C. Smith, Jr.* and *Paul C. Rosenthal*) for defendant-intervenors.

---

[*] With the consent of the parties, this public version is being issued without the redaction of any information contained in the confidential version of this Opinion and Order.

Stanceu, Judge: Plaintiff Atar S.r.L. ("Atar"), an Italian producer and exporter of pasta products, contests the final results issued by the International Trade Administration, United States Department of Commerce ("Commerce" or the "Department"), in the ninth administrative review of an antidumping duty order on certain pasta from Italy. Atar challenges the Department's finding of a "particular market situation" and its resulting decision to use the "constructed value" provisions of the antidumping statute, rather than the "third country sales" provisions, as the basis for determining the normal value of Atar's merchandise that was subject to the antidumping duty order and the review. In the alternative, Atar challenges certain decisions Commerce made in the constructed value calculation. Defendant and defendant-intervenors argue that these challenges lack merit and that the court should uphold the final results in their entirety. For the reasons discussed in this Opinion and Order, the court concludes that Commerce's decision to proceed under the constructed value provisions of the statute was lawful. However, the court also concludes that the Department's constructed value determinations are, in some respects, not in accordance with law. On remand, the court orders Commerce to reconsider, and redetermine as necessary, the constructed value of Atar's merchandise.

## I. BACKGROUND

Commerce published the final results of the ninth administrative review ("Final Results") in February 2007. *Notice of Final Results of the Ninth Admin. Review of the Antidumping Duty Order on Certain Pasta from Italy*, 72 Fed. Reg. 7011 (Feb. 14, 2007) ("*Final Results*"). Plaintiff brought this action contesting the Final Results on March 7, 2007. Before the court is plaintiff's motion under USCIT Rule 56.2 for judgment upon the agency record.

Commerce initiated the ninth administrative review on August 29, 2005 and published preliminary results of the review ("Preliminary Results") on August 8, 2006. *See Notice of Prelim. Results and Partial Rescission of Antidumping Duty Admin. Review: Ninth Admin. Review of the Antidumping Duty Order on Certain Pasta from Italy*, 71 Fed. Reg. 45,017, 45,018 (Aug. 8, 2006) ("*Prelim. Results*"). The review covered two manufacturer/exporters, one of which was Atar, and pertained to entries of certain non-egg dry pasta[1] (the "subject merchandise") made during the period July 1, 2004 through June 30, 2005 ("period of review" or "POR"). *Id.*

Because Atar's sales of the foreign like product in its home market were less than five percent of the aggregate of the sales of Atar's subject merchandise to the United States during the period of review, Commerce found in the Preliminary Results that Atar did not have a viable home market for purposes of determining the normal value of Atar's subject merchandise that was sold in the United States during that period. *Id.* at 45,019; *see* 19 U.S.C. § 1677b(a)(1)(C) (2000). In response to this finding, Atar submitted information on its third-country selling activity in Angola, arguing that the Department should calculate normal value based on that activity. *See Issues and Decisions for the Final Results of the Ninth Admin. Review of the Antidumping Duty Order on Certain Pasta from Italy and Determination to Revoke in Part* 2, 4 (Admin. R. Doc. No. 150) ("*Decision Mem.*").

[1] Imports covered by the order were shipments of certain non-egg dry pasta in packages of five pounds four ounces or less, whether or not enriched or fortified or containing milk or other optional ingredients. *See Notice of Final Results of the Ninth Admin. Review of the Antidumping Duty Order on Certain Pasta from Italy*, 72 Fed. Reg. 7011, 7012 (Feb. 14, 2007).

Commerce determined in the review that a "particular market situation," within the meaning of that term as used in 19 U.S.C. § 1677b(a)(1)(B)(ii)(III) and (a)(1)(C)(iii), prevented a proper comparison between Atar's selling activity in Angola and export price. Commerce explained its conclusion in an internal Issues and Decisions Memorandum ("Decision Memorandum") that it incorporated by reference in the Final Results. *See Final Results*, 72 Fed. Reg. at 7012. In the Decision Memorandum, Commerce stated a finding that Atar's selling activity in Angola during the period of review consisted of a single sale. *Decision Mem.* 7. Commerce further found that Atar did not have an established market in Angola for sales of the foreign like product during the period of review. *Id.* at 7-8. Additionally, Commerce found that significant differences existed between the terms and conditions of the sale in Angola and the sales made in the U.S. market that "would prevent a proper comparison even if an established market existed." *Id.*

The Final Results, published on February 14, 2007, assigned Atar a weighted-average antidumping duty margin of 18.18%. *Final Results*, 72 Fed. Reg. at 7012. The Final Results reflected Commerce's conclusion that Atar's sales in Angola could not properly serve as the basis for determining normal value because of the particular market situation that Commerce found to exist with respect to Atar's selling activity in the Angolan market. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III) and (a)(1)(C)(iii). Having rejected Atar's proposal that Angola serve as a third country comparison market, Commerce resorted to constructed value. *Decision Mem.* 19; *see* Def.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. 16 ("Def.'s Br."). In so doing, when calculating Atar's constructed value indirect selling expense ("ISE") and constructed value profit rate, Commerce used the weighted average indirect selling expenses and

profit rate of the six respondents (not including Atar) from the previous (eighth) period of review for sales occurring in the ordinary course of trade. *Decision Mem*. 15, 20. Also, the Department increased Atar's selling, general and administrative expenses to account for services provided to Atar by a shareholder who elected to forego compensation for those services. *Id.* at 24-26.

## II. DISCUSSION

The court must uphold the Final Results unless they are unsupported by substantial evidence on the record or are otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i) (2006). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Atar argues, first, that Commerce erred in refusing to determine normal value according to Atar's third country selling activity in Angola. Mot. for J. on the Agency R. Submitted Pursuant to Rule 56.2 of the Rules of the U.S. Court of Int'l Trade 18-34 ("Pl.'s Br."). Contending that Commerce incorrectly found that a "particular market situation" prevented a proper price comparison of Atar's U.S. sales to its selling activity in Angola, Atar argues that a particular market situation analysis "can only be used in very limited circumstances where it is impossible to properly compare a respondent's U.S. sales with its sales in the comparison market." *Id.* at 2. According to Atar, "no legal basis for a finding of [a particular market situation] was established on the facts of record." *Id.*

Atar's second, and alternative, challenge to the Final Results is to Commerce's calculation of ISE and profit for use in the constructed value determination. *Id.* at 39-65. Atar claims that Commerce erred when, in performing the constructed value determination for Atar, it

used the indirect selling expenses incurred, and the profits realized, on sales made in the ordinary course of trade by six respondent companies (other than Atar) in the previous (eighth) administrative review. Atar argues that in so doing, Commerce did not comply with the statutory requirement in 19 U.S.C. § 1677b(e)(2)(B)(iii) to calculate ISE and profit according to a "reasonable method." *Id.* at 39-65; 19 U.S.C. § 1677b(e)(2)(B)(iii).

Finally, Atar contends that Commerce acted unlawfully when, in determining constructed value, it included in the calculation of Atar's selling, general and administrative expenses an amount for the value of certain services rendered to Atar by its principal, a shareholder in the company who made a decision to forego salary. Pl.'s Br. 66-67. Atar argues that Commerce acted contrary to law in valuing those services based on the total amount of dividends paid by Atar to the principal. *Id.*

A. Commerce Acted Lawfully in Declining to Determine Normal Value Based on Atar's Third Country Selling Activity

Atar challenges Commerce's findings that Atar's selling activity in Angola constituted a single sale and that, for purposes of 19 U.S.C. § 1677b(a)(1)(B)(ii)(III) and (a)(1)(C)(iii), a particular market situation existed with respect to that sale that prevented a proper comparison with export price. *See Final Results*, 72 Fed. Reg. at 7012. Atar argues that it actually made multiple sales in Angola, rather than one sale as the Department found. Pl.'s Br. 19-24. Atar argues, further, that the Department improperly concluded that a particular market situation existed and that what the Department considered to be significant differences between Atar's U.S. sales and Angolan sales were actually minor and insignificant. *Id.* at 2, 19-34. Next, Atar contends that Commerce lacked the legal authority to conduct a "particular market situation"

analysis in the absence of a specific allegation by a party that a particular market situation existed. *Id.* at 34-37. Finally, Atar claims that even if the regulations permitted a particular market situation analysis in the absence of an allegation, Commerce's stated intention in the Preliminary Results to use such an analysis was not timely and did not allow Atar an adequate opportunity to register its opposition. *Id.* at 37-39. The court does not find merit in these arguments.

1. Commerce's Determination that a Single Sale Occurred Between Atar and Its Angolan Customer Is Supported by Substantial Record Evidence

In finding that Atar made only a single sale in the Angolan market during the period of review, Commerce relied on record evidence including an agreement ("Sale Agreement") setting forth certain terms for the sale of pasta by Atar to a single customer in Angola, dates of invoices, Atar's rebuttal comments submitted during the review, and a statement from an Atar employee. *See Decision Mem.* 8; *see also Resp. of Atar S.r.l. to Fourth Supplemental Antidumping Duty Questionnaire Ninth Admin. Review*, Ex. S-10 ("*Sale Agreement*")[2] (June 30, 2006) (Confidential Admin. R. Doc. No. 30; Admin. R. Doc. No. 93) ("*Atar's Fourth Supplemental Questionnaire Resp.*"); *Admin. Review of the Antidumping Duty Order on Certain Dry, Non-Egg Pasta from Italy: 07/01/04-06/30/05; Determination of Particular Market Situation; Resp. to Dep't of Commerce letter dated August 1, 2006* 12-16 (Aug. 25, 2006) (Confidential Admin. R. Doc. No. 44) ("*Atar's Confidential Resp.*"). From this record evidence, Commerce concluded that the

[2] Although Atar claimed proprietary treatment for the existence of the agreement during the administrative proceeding, the company publicly discussed the agreement in its Rule 56.2 brief. *See* Mot. for J. on the Agency R. Submitted Pursuant to Rule 56.2 of the Rules of the U.S. Court of Int'l Trade 21-22.

material terms of sale were established by the Sale Agreement and that Atar's selling activity in Angola constituted a single sale with multiple shipments. *See Decision Mem.* 11.

Atar contends that the record demonstrates that Atar made multiple, distinct sales in Angola during the period of review rather than the one sale the Department found. Pl.'s Br. 19. Atar points to the invoice dates of its shipments, arguing that the Department, pursuant to 19 C.F.R. § 351.401(i) (2006), routinely uses the invoice date as the date of sale unless a different date better demonstrates the date on which the material terms of sale were established. Pl.'s Br. 19-20. According to Atar, each of the separate invoices, per 19 C.F.R. § 351.401(i), is record evidence of a separate sale because the invoices established material terms of sales. *Id.* at 20-22; *see* 19 C.F.R. § 351.401(i). Atar argues that the Sale Agreement was an informal preliminary agreement, not a binding sales contract. Pl.'s Br. 19-24. Atar submits that essential terms, such as port of destination, quantities, and production and shipment dates, were subject to change after the Sale Agreement was signed. *Id.* at 21-22. Atar argues that without a port of destination, the destination of the goods ("a key material term . . . not defined in the agreement") and the cost of shipping are not agreed upon. Reply to Resps. of Def. and Def.-Intervenor to Pl.'s Mot. for J. on the Agency R. Submitted Pursuant to Rule 56.2 of the Rules of the U.S. Court of Int'l Trade 16 ("Pl.'s Reply"). Atar also argues that the Sale Agreement provides no penalty for non-delivery of product or other contractual violations and that the price paid in the actual currency of the transaction (U.S. dollars, rather than Euros) was not established until the invoice date. *Id.* at 17. Further, Atar argues that "[e]ach shipment [into Angola] required a separate import license tailored specifically to the prices and quantities reflected in the pro-forma invoice and not to the preliminary prices and quantities reflected in the memo of understanding," a fact

that, along with the requirement for each shipment to have a separate pro-forma invoice, "supports the conclusion that the invoice date, rather than the date of the memorandum of understanding, is the date of sale." Pl.'s Br. 23.

The court is not convinced by plaintiff's argument that Commerce, on the record facts, was required by its regulation, 19 C.F.R. § 351.401(i), to regard each invoice as constituting a separate sale. The cited regulation provides that the Secretary of Commerce "normally" will use the date of invoice as the date of sale, but the regulation also qualifies the normal practice, stating that "the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." 19 C.F.R. § 351.401(i); *see also Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,349 (May 19, 1997) (the "*Preamble*") ("If the Department is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of invoice, the Department *will use that alternative date as the date of sale*." (emphasis added)); *see also* Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, Art. 2.4.1, n.8 (1994) (stating that "[n]ormally, the date of sale would be the date of contract, purchase order, order confirmation, or invoice, whichever establishes the material terms of sale"). The pertinent question, therefore, is whether substantial evidence of record supports Commerce's finding that the Sale Agreement established the material terms of Atar's entire selling activity in Angola during the period of review. The court concludes that it does.

During the review, Commerce instructed that Atar report as its "date of sale" the date on which the material terms of sale were established. In its initial questionnaire responses, Atar did not disclose the existence of a sales agreement pertaining to its selling activity in Angola. *See Atar's Section A Questionnaire Resp.* 11 (Oct. 31, 2005) (Admin. R. Doc. No. 26) ("[A]ll sales in both markets were initiated by the customer's purchase order . . . . Atar then communicates the order to its unaffiliated tolling processors and . . . issues a commercial invoice to the customer."). Atar claimed during the review that the invoice date was the proper date of sale. *See Letter Regarding § 751 Admin. Review of the Antidumping Duty Order on Certain Dry, Non-Egg Pasta from Italy: 07/01/04-06/30/05* at 10 (Dec. 2, 2005) (Admin. R. Doc. No. 41) ("Invoice date has been used as the date of sale by Atar in each review as it represents the date that all material terms are fixed . . . ."). Atar disclosed the existence of the Sale Agreement only in response to questioning from the Department, which observed that the invoice date for Atar's first sale in Angola preceded the date on which Atar instructed its toll processor to produce pasta. Atar acknowledged that its submitted description of its sales practices in Angola "was not properly qualified" and explained that "Atar invoiced . . . pursuant to the prices agreed upon with the third party trading company in the price agreement, at the quantities ordered by phone . . . ." *Atar's Fourth Supplemental Questionnaire Resp.* 11. Atar went on to explain that "[p]rices and all relevant sales terms are contained in the agreement, attached as *Exhibit S-10*." *Id.* at 12. Commerce found that the Sale Agreement established the material terms of a sale and that the material terms so established did not change. *Decision Mem.* 12 (stating that there was "no documentary evidence that the terms [of the Sale Agreement] were subject to change, nor did the essential terms change in any way from those specified").

Commerce acts reasonably, and within its authority, in considering a sale or an agreement to sell to exist as of the time when the material terms of sale, *i.e.*, price and quantity, have been established between the foreign producer/exporter and the customer. *See Corus Staal BV v. United States*, 502 F.3d 1370, 1376 (Fed. Cir. 2007) ("Neither a sale nor an agreement to sell occurs until there is mutual assent to the material terms (price and quantity)."). In this review, Commerce determined that the Sale Agreement, which was signed by Atar and dated by its Angolan customer, established price and quantity and thereby established the material terms of a sale by Atar to that customer. *Decision Mem.* 12. With regard to quantity, Commerce found that "[t]he quantity specified in the sales agreement is identical to the quantity invoiced and delivered." *Id.* The Department concluded that the price was established in the Sale Agreement because "[t]he record shows that the euro price established in the [Sale Agreement] is the controlling price. . . . This euro price does not change [al]though foreign currency exchange rates may fluctuate from day to day." *Id.* at 13. Commerce noted that "Atar itself on several occasions referred to the terms of sale, as established in the agreement, as fixed." *Id.* (quoting the Atar submission stating that "[p]rices and all relevant sales terms are contained in the agreement, attached as Exhibit S-10 and are not typically reiterated by the parties").

On this record, the court is unable to agree with plaintiff that Commerce, having found that the Sale Agreement established the price and quantity terms of a sale, erred in concluding that other matters did not constitute essential terms. By Atar's own admission, "[p]rices and all relevant sales terms are contained in the agreement." *Atar's Fourth Supplemental Questionnaire Resp.* at 12. Atar argues that Commerce failed to consider a statement of an Atar official, submitted by Atar, attesting to a personal belief that the Sales Agreement "did not constitute a

binding agreement to sell a fixed quantity of pasta at a fixed price." Pl.'s Br. 23-24. In considering the record evidence as a whole, Commerce was not required to accord controlling weight to this self-serving statement, which appears to offer a legal conclusion on whether the Sale Agreement is enforceable rather than inform Commerce of facts probative on the issue of whether the Sale Agreement established the material terms of sale. The court is also unconvinced by Atar's argument that the requirement for each shipment to be accompanied by a separate import license in Angola that is tied to a separate pro forma invoice supports the conclusion that the invoice date, rather than the date of the Sale Agreement, is the date of sale. *See id.* at 23. The pertinent determination is the date upon which the material terms of a sale of merchandise were settled between the parties. The existence of an import licensing requirement in Angola that applies to each separate shipment and invoice does not refute the substantial record evidence that the Sale Agreement settled these terms.

In summary, the court concludes, based on its examination of the record evidence, including the Sale Agreement and Atar's own admission in communications with the Department during the review, that substantial evidence supports Commerce's findings that the material terms of sale were established by the Sale Agreement and that Atar's selling activity in Angola during the review consisted of a single sale.

<u>2. Commerce's Determination that Atar's Angolan Selling Activity Should Not Be Compared to Atar's U.S. Sales Due to a Particular Market Situation Is Supported by Substantial Record Evidence</u>

The court next considers Atar's claim that the record does not support Commerce's determination that a "particular market situation" existed under which Commerce could not make a proper comparison between Atar's selling activity in Angola and Atar's U.S. sales. The term

"particular market situation" is not defined by the statute, Commerce's regulations, or the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III) and (a)(1)(C)(iii); 19 C.F.R. § 351.404(c)(2)(i) (2006); Uruguay Round Agreements Act Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, at 656 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040. Under the language in the statute, Commerce has considerable discretion in determining whether a particular market situation in a third country prevents a proper comparison with export price or constructed export price. Nevertheless, the court must consider whether such a determination is supported by substantial record evidence and is otherwise in accordance with law. In so doing, it must consider whether the determination is based on "[a] rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

Commerce based its determination on several findings. The Department found that the sale Atar made during the POR in Angola constituted a low percentage of the aggregate volume of Atar's U.S. sales for the POR. *See Ninth Admin. Review of Pasta from Italy - Determination of Particular Market Situation* 2 (Aug. 1, 2006) (Confidential Admin. R. Doc. No. 40; Admin. R. Doc. No. 106) ("*Particular Market Situation Mem.*"). Finding according to record evidence that Atar did not make any sales of the foreign like product in Angola *prior to* the period of review, the agency found that Atar did not have an established market in Angola *during* the period of review, during which only the single sale occurred. *Id.* (concluding, in the absence of other sales of pasta, that "there is no reason to believe that a single sale of pasta would be indicative of an established market"); *see Decision Mem.* 10. In concluding that Atar lacked an established market in Angola during the period of review, the Department also considered evidence

consisting of four invoices that Atar placed on the record pertaining to selling activity in Angola *after* the POR. *Decision Mem.* 11. Commerce concluded that these invoices, although speaking to the development of a market over time, were not evidence of an established market prior to the sales represented by the four invoices. Commerce reasoned as follows:

> [W]e note that Atar has placed four invoices on the record of this review as evidence of subsequent sales. Atar did not provide the Department with any sales agreement relating to any of these four subsequent shipments. Consequently, the Department cannot determine whether these four invoices constitute one or more sales, as evidence on the record of this review indicates that multiple invoices may be generated for a single sale. Because the record evidence regarding these subsequent transactions is scant and inconclusive, the Department does not find that the record evidence with respect to subsequent sales provides sufficient support for a finding that during the POR Atar had an established market in Angola for the foreign like product.

*Decision Mem.* 11. The Department found, further, that the particular structure of Atar's sale in Angola prevented a proper comparison with Atar's sales in the United States in that Atar's sales of pasta in Angola, unlike the company's U.S. sales, were made through a "triangular" selling arrangement; *i.e.*, a Lebanese company ordered pasta from Atar on behalf on the Angolan customer. *Particular Market Situation Mem.* 3; *see also* Def.'s Br. 5 (citing *Letter Regarding § 751 Admin. Review of the Antidumping Duty Order on Certain Dry, Non-Egg Pasta from Italy: 07/01/04-06/30/05* at 8-9 (Dec. 1, 2005) ("*Atar's Dec. 1, 2005 Rebuttal Comments*") (Confidential Admin. R. Doc. No. 5)). Atar issued invoices to, and received payment from, the Lebanese company but shipped its pasta to the Angolan customer. *See Particular Market Situation Mem.* 3; *see also* Def.'s Br. 5 (citing *Atar's Dec. 1, 2005 Rebuttal Comments* 8-9).

Atar argues, unpersuasively, that the appropriate test for whether an established market exists is whether a market was established for the foreign like product, not whether a market was

established for a foreign like product sold by Atar. Pl.'s Br. 24-25. Because the relevant issue was whether Atar's presence in the Angolan market was appropriate to serve as a comparison market for Atar's U.S. sales, it was reasonable for Commerce to consider Atar's own market experience in Angola. Commerce logically considered the evidence Atar submitted to be, on the whole, insufficiently probative on the question of whether a market existed for Atar's products in Angola. *Decision Mem.* 9-10 (noting that Atar's evidence consisted of "invoices of pasta and other products which Atar did not produce" and that "pet food and corn meal are not within the definition of foreign like product in this case"). Commerce also found, based on the record evidence, that "the vast majority of invoices" submitted by Atar consisted of sales to markets in Africa *other than* Angola, including Togo, Congo, Kenya, and Somalia. *Id.* at 9.

In its brief to the court, Atar argues that the differences between the U.S. markets and the Angolan markets were either formalistic or of a type that Commerce could address adequately by calculating artificial additional costs for ordinary operations. Pl.'s Br. 30-33. The court rejects this argument because substantial record evidence supports Commerce's finding that Atar's sales to the United States and Atar's sale to Angola differed in material respects. *See Decision Mem.* 11. Those differences included direct versus indirect sales; differences in product mix; differences in the timing and sequencing of sale, order, production, invoicing, and shipment; and significant differences in the average payment date. *Id.*

The Department took the position that it could adjust for "common differences in terms of sales where such differences are quantifiable." *Id*. It stated, however, that "we have no accurate means through which to measure the effect on price of other, much more unusual differences, *e.g.*, the significant difference in the timing and manner in which order, production,

invoicing, shipment and payment occur." *Id.* The Department viewed the triangular sale arrangement affecting Atar's sale to Angola as distinguishable from the arrangement of Atar's sales in the United States; based on Atar's verification statements, Commerce found that title and ownership of pasta were transferred to the trading company at the time of invoicing, making it unclear whether Atar ever held title to the finished pasta it allegedly sold. *Id.* As Commerce pointed out, Atar itself acknowledged at various points in the process that its sale to Angola was unique and admitted that the manner in which it sold to Angola "is in strict contrast to the U.S. market for which no special import licenses are required, no pro-forma invoices are necessary." *Id.* at 12 (quoting Atar in submissions in which the company commented that "[t]he Angolan sales and invoicing process is *significantly different*" and referred to "*unique* requirements for selling product to Angola," the "*unique* nature of the Angolan market," and the "*unique* nature of the triangular sales arrangement." (emphasis in *Decision Mem.*)). Based on the record evidence and the analysis set forth in the Decision Memorandum, the court concludes that Commerce reasonably determined that it could not make a proper comparison between these different types of sales, even through the use of adjustments.

Citing *Chemetals, Inc. v. United States*, 25 CIT 232, 138 F. Supp. 2d 1338 (2001), Atar claims that Commerce should have concluded that Atar's selling activity in Angola did not present a particular market situation. Pl.'s Br. 27-28. Atar points to language in the opinion in that case stating that "even a single entry of subject merchandise is sufficient where such an entry is indicative of the respondent's regular pricing practices." *Id.* 27 (quoting *Chemetals*, 25 CIT at 242, 138 F. Supp. 2d at 1350). The language from *Chemetals* relied on by Atar is not on point. The opinion in *Chemetals* expressly uses the reference to a possible single sale to illustrate the

principle that "the statute sets no minimum quantity of *U.S. sales* that may be used in making the direct comparison to home market sales." *Chemetals*, 25 CIT at 242, 138 F. Supp. 2d at 1350 (emphasis added).

In summary, the court concludes that Commerce's decision not to use Atar's third country selling activity in Angola for purposes of determining normal value, based on a finding of a particular market situation affecting that selling activity, is supported by substantial record evidence and is also supported by a rational explanation for the choice Commerce made.

3. Commerce Did Not Err in Proceeding with a "Particular Market Situation" Analysis Without an Allegation

Commerce considered, and decided, whether Atar's proposed third-country comparison market was affected by a particular market situation without first having received from a party to the review an allegation that a particular market situation existed. Atar objects to Commerce's proceeding with its analysis in the absence of such an allegation. Pl.'s Reply 10. Atar directs the court's attention to certain language in the preamble accompanying the promulgation of the Department's regulations (the "Preamble"), which states, "[t]here are a variety of analyses called for . . . that the Department typically does not engage in *unless it receives a timely and adequately substantiated allegation from a party.*" Pl.'s Br. 34-35 (quoting *Preamble*, 62 Fed. Reg. at 27,357) (emphasis in Pl.'s Br.). Atar argues further that, if Commerce proceeds without an allegation, it "must provide a substitute for the allegation," and the substitute "must fall within the time lines contemplated by the statute and regulation." Pl.'s Reply 10-11. Atar claims, in addition, that by proceeding as it did, Commerce left Atar no effective way to address the issues involving the comparison market that Atar proposed. *Id.* at 10.

The general shortcoming in plaintiff's argument is that neither the statute nor the regulations prohibit Commerce from determining, even absent an allegation, that a third-country market is affected by a particular market situation. Moreover, the Preamble language, in stating that Commerce "typically" proceeds only upon a timely allegation, does not state or imply that Commerce intended to confine its own discretion such that it could not act *sua sponte*. *See Preamble*, 62 Fed. Reg. at 27,357. Nor do the statute or regulations require Commerce to provide a "substitute" for such an allegation. Atar's argument that, absent an allegation, it has no effective opportunity to respond hinges on certain provisions in Commerce's regulations, namely 19 C.F.R. §§ 351.404 and 351.301(d)(1) (2006). *See* Pl.'s Br. 34-39. Under these provisions, allegations regarding market viability generally, and specific allegations regarding the existence of a particular market situation in the exporting country or a third country, must be made according to specified time limits. *See* 19 C.F.R. § 351.404(d) (requiring that allegations involving a particular market situation be made in accordance with § 351.301(d)(1)); 19 C.F.R. § 351.301(d)(1) (requiring that the allegation be made within forty days of the transmission of the initial questionnaire unless the Secretary alters this time limit). Atar argues that allegations regarding a particular market situation "must" be submitted within forty days of the transmission of the initial questionnaire, as required by 19 C.F.R. § 351.301(d)(1), and that "[t]his regulation is as binding on Commerce as it is to parties to the proceeding." Pl.'s Reply 12. This argument ignores the purpose of 19 C.F.R. § 351.301, which is to govern time limits for submission of factual information *from interested parties*; the section does not address the question of a time limit when the particular market situation analysis originates with Commerce. *See* 19 C.F.R. § 351.301(a) ("The Department obtains most of its factual information in antidumping and

countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. This section sets forth the time limits for submitting such factual information . . . .").

The record does not support Atar's contention that it was denied an effective opportunity during the review to address the question of whether its proposed comparison market in Angola was affected by a particular market situation. Commerce announced its finding of a particular market situation in the Preliminary Results. *See Prelim. Results*, 71 Fed. Reg. at 45,020. Atar argues that its opportunity to submit arguments on the preliminary determination was "meaningless" because Commerce did not make its final particular market situation determination until it issued the Final Results, thereby "effectively depriv[ing Atar] of the opportunity to comment on the actual logic of Commerce in making the [particular market situation] determination." Pl.'s Reply 11 (footnote omitted). Atar itself acknowledges, however, that a primary item of information that triggered Commerce's particular market situation analysis–the Sale Agreement–was not filed until late in the proceedings. *See id.* at 13, n.5. Also, neither the statute nor the Department's regulations require Commerce to provide a party the opportunity to comment on a particular market situation analysis prior to issuing the Preliminary Results. *See Preamble*, 62 Fed. Reg. at 27,357 ("[T]he Department's [antidumping] methodology contains presumptions that certain provisions of section [1677b] do not apply unless adequately alleged by a party or unless the Department uncovers relevant information on its own."); *see also* 19 U.S.C. § 1677m(g) (2000) (entitling a respondent to comment on all information in the record prior to the Final Results). Atar in fact submitted comments and information in response to the particular market situation finding by Commerce and submitted

additional comments in its case brief to the agency. *See Atar's Confidential Resp.* 1; *Case Br. of Atar Srl Ninth Admin. Review* 4-46 (Dec. 28, 2006) ("*Atar's Admin. Case Br.*") (Confidential Admin. R. Doc. No. 56). For these reasons, the court does not find merit in Atar's arguments concerning the lack of an allegation, the lack of a "substitute" for an allegation, and the alleged lack of an opportunity to comment on the analysis by which the Department concluded that a particular market situation affected Atar's proposed comparison market.

B. The Court Remands the Final Results for Reconsideration of the Department's Determinations of Constructed Value ISE and Profit

The court is remanding the Final Results to the Department for reconsideration, and redetermination as necessary, of its determinations of Atar's constructed value ISE and profit, which are not supported by adequate reasoning. Although concluding that certain of the decisions Commerce made in making these determinations were in accordance with law, the court concludes that these determinations, considered as a whole, do not meet the statutory requirement expressed in 19 U.S.C. § 1677b(e)(2)(B)(iii) that constructed value ISE and profit be determined according to a "reasonable method."

The constructed value of the merchandise of a respondent producer or exporter usually is calculated as the sum of (1) the cost of materials and processing used in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of business; (2) the actual selling, general, and administrative expenses incurred by the producer or exporter, and actual profits realized by the producer or exporter, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country; and (3) the costs of all containers and coverings and all

other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States. 19 U.S.C. § 1677b(e)(1), (e)(2)(A), (e)(3). The Department calculated a constructed value for Atar's ISE and profit ratios by using the weighted-average indirect selling expenses and a weighted-average profit rate derived from the home market data of six respondent companies in the previous (eighth) administrative review ("Final Results 8th Review").[3] *See Decision Mem.* 20-23 (citing *Notice of Final Results of the Eighth Admin. Review of the Antidumping Duty Order on Certain Pasta From Italy and Determination to Revoke in Part*, 70 Fed. Reg. 71,464 (Nov. 29, 2005)). Commerce confined its calculations to data pertaining to sales of those six respondents that were in the ordinary course of trade.

In calculating a constructed value for Atar's subject merchandise, the Department determined that it could not proceed under 19 U.S.C. § 1677b(e)(2)(A) because Atar lacked a viable comparison market. *Id.* at 19. Commerce explained that because it had rejected the use of Atar's selling activity in Angola as a comparison market, it could not rely on the actual ISE incurred, and profit realized, in the single sale in Angola when determining Atar's constructed value ISE and profit. *Id.* Accordingly, Commerce considered each of the three alternatives in § 1677b(e)(2)(B)(i)-(iii).

Commerce determined that it could not proceed under alternatives (i) and (ii), and calculated constructed value profit and ISE for Atar under alternative (iii), of § 1677b(e)(2)(B).

---

[3] The six respondent companies are Barilla G.e.R. Fratelli, S.p.A. (formerly Barilla Alimentare, S.p.A.), (2) Corticella/Combattenti, (3) Industrie Alimentare Colavita, S.p.A., (4) Pastificio F.lli Pagani S.p.A., (5) Pastificio Antonio Pallante S.r.L. and its affiliate Vitelli Foods LLC, and (6) Pastificio Riscossa F.lli Mastromauro, S.r.L. *Issues and Decisions for the Final Results of the Ninth Admin. Review of the Antidumping Duty Order on Certain Pasta from Italy and Determination to Revoke in Part* 15, n.5 (Admin. R. Doc. No. 150).

Commerce disregarded alternative (i) because Atar did not produce any products other than the subject merchandise. *Id.* at 20. Alternative (ii), Commerce concluded, was unavailable because the use of data of the only other respondent in the review, Corticella, would "reveal the business-proprietary nature of that information," Corticella having failed to provide publicly ranged sales and cost data. *Id.* at 19-20. Accordingly, the agency proceeded under alternative (iii), which permits the Department to use "any other reasonable method," subject to the "profit cap" limitation on the determination of constructed value profit. 19 U.S.C. § 1677b(e)(2)(B)(iii). Commerce reasoned that, in accordance with the strong preference in § 1677b(e)(2)(B)(i)-(iii) for the calculation of constructed value profit using data on sales in the home country market, Commerce would use the profit and ISE data from six Italian producers' home market sales from the Final Results 8th Review. *Decision Mem.* 20. Commerce described its methodology as similar to that set forth in alternative (ii), "the only difference being that the methodology used is based on respondents of the preceding review rather than respondents of the current review." *Id.*

1. Commerce Acted Lawfully in Deciding Not to Use Atar's Profit and ISE Data from Selling Activity in Angola in Determining Constructed Value

Atar argues that, even if the court upholds Commerce's finding of a particular market situation, the court should conclude that Commerce erred in not using data on Atar's own profit and ISE for its sales activity in Angola when calculating the constructed value of Atar's merchandise. Pl.'s Br. 42-47 (citing 19 U.S.C. § 1677b(a)(4) and 19 U.S.C. § 1677b(a)(1)(B)(ii)). According to Atar, Commerce could have used the method of 19 U.S.C. § 1677b(e)(2)(A) because that provision directs Commerce to determine constructed value ISE and profit based on the exporter's sales of the foreign like product, in the foreign country, that are

made in the ordinary course of trade. *Id.* at 44 ("Section [1677b(e)(2)(A)] does not prevent Commerce from using a producer/exporter's actual experience merely because the market may not be 'viable.'"). Atar argues that a finding of a particular market situation does not mean that the sales are not made in the ordinary course of trade for purposes of 19 U.S.C. § 1677b(e)(2)(A).

Although Atar does not so state, the court understands Atar's argument to rely on 19 C.F.R. § 351.405 (2006). In this regulation, which construes 19 U.S.C. § 1677b(e)(2)(A) and (e)(2)(B), Commerce addresses the constructed value calculation and "clarifies" the meaning of certain terms relating to constructed value. *See* 19 C.F.R. § 351.405. Commerce's regulation defines the same statutory term, "foreign country," to include a third country for purposes of 19 U.S.C. § 1677b(e)(2)(A) but not for purposes of 19 U.S.C. § 1677b(e)(2)(B). *See id.* § 351.405(b) (referencing 19 C.F.R. § 351.404(e), which addresses criteria for the selection of a third country for purposes of calculating normal value). In *Thai I-Mei Frozen Foods Co., Ltd. v. United States*, 32 CIT ___, ___, 572 F. Supp. 2d 1353, 1370-71 n.4 (2008) ("*Thai I-Mei II*"), the validity of 19 C.F.R. § 351.405 was questioned. The opinion noted that Commerce, when promulgating this regulation, rejected the position of commenting parties that Commerce, impermissibly and contrary to established principles of statutory construction, was attempting to adopt inconsistent definitions of the same statutory term as that term appeared in the two subparagraphs of 19 U.S.C. § 1677b(e)(2). *Thai I-Mei II*, 32 CIT at ___, 572 F. Supp. 2d at 1370-71 n.4 (citing *Preamble*, 62 Fed. Reg. at 27,358). However, even if the court were to assume, for purposes of this case, that the regulation is valid and would have enabled Commerce to apply § 1677b(e)(2)(A) on this record, the court still could not conclude that Commerce acted unlawfully in declining to proceed in the way plaintiff advocates. Commerce found that the

particular market situation that existed with respect to Atar's sale in Angola prevented a proper comparison between Atar's selling activity in Angola and its selling activity in the United States. Commerce decided against relying on Atar's ISE and profit for Angola because doing so would result in constructing an Angolan price, which the agency concluded would not provide a proper basis for comparison. *Decision Mem.* 19 ("Since price is equal to cost plus profit, to base [constructed value] profit on the sale to Angola in effect would result in us [*sic*] constructing the Angolan sale price. As a result, we cannot determine [constructed value] ISE and profit under section [1677b(e)(2)(A)] (the preferred method), which requires comparison market sales by the respondent to be used as the basis for ISE and profit."). The Department's decision not to use Atar's selling activity in Angola as the source of data for determining constructed value ISE and profit rested on the several findings regarding Atar's sale to Angola that supported Commerce's ultimate finding of a particular market situation. As discussed previously, the administrative record contains substantial evidence supporting those findings. Regardless of whether Commerce validly *could* have used the ISE and profit data from the sale in Angola in its constructed value determination, the court is unable to conclude that Commerce was *required* to do so.

2. Commerce Acted Lawfully in Deciding Not to Use the Corticella Data

Having concluded that determining constructed value ISE and profit for Atar according to 19 U.S.C. § 1677b(e)(2)(A) was inappropriate for this review, Commerce determined these elements of constructed value according to § 1677b(e)(2)(B). Commerce was correct in its conclusion, not challenged by Atar in this litigation, that alternative (i) of § 1677b(e)(2)(B) was unavailable because Atar did not produce any merchandise other than the subject merchandise.

19 U.S.C. § 1677b(e)(2)(B)(i). Atar challenges Commerce's decision not to resort to alternative (ii) and specifically takes issue with Commerce's reasoning that reliance on the submitted information of Corticella, the only other respondent in the current review, "would reveal the business-proprietary nature of that information." *Decision Mem.* 20. According to Atar, Corticella's data were the "perfect surrogate," and the problem Commerce identified–that use of the data would reveal Corticella's confidential information in the absence of a publicly ranged version–should not have prevented Commerce from using those data. Pl.'s Br. 64-65. Atar argues that it was unfairly punished for Corticella's failure to produce its publicly ranged data pursuant 19 C.F.R. § 351.304(c) (2006). *Id.* at 49.

This Court, in analogous circumstances involving data of a single respondent, previously has affirmed Commerce's refusal to rely on business proprietary selling expense data and profit under alternative (ii) where use of such data would reveal that business proprietary information. *Geum Poong Corp. v. United States*, 25 CIT 1089, 1092, 163 F. Supp. 2d 669, 674 (2001) ("*Geum Poong I*") ("Because calculating [constructed value] profit under Alternative Two . . . would result in a [constructed value] profit ratio that impermissibly revealed Samyang's proprietary profit ratio, Commerce properly determined that Alternative Two was unavailable."). In this case, Commerce acted reasonably and in accordance with law in declining to proceed under 19 U.S.C. § 1677b(e)(2)(B)(ii) because of its concern over the business-proprietary nature of Corticella's information. As Commerce pointed out, statutory and regulatory restrictions apply to the dissemination of a respondent's business proprietary information. *See* 19 U.S.C. § 1677f(b)-(c) (2006); 19 C.F.R. § 351.306(a) (2006); *see* Def.'s Br. 37 ("Congress strictly limits Commerce's release of a respondent's business proprietary information to individuals subject to

an administrative protective order, employees of Commerce connected with a given review, and employees of Customs and Border Protection in connection with a Customs fraud investigation.”). In the absence from the record of a nonproprietary version of the Corticella data, Commerce had a valid reason for rejecting alternative (ii) as a basis for determining constructed value ISE and profit.

Atar’s argument that it was unfairly punished by Corticella’s failure to place on the record a nonproprietary version of its data relies on Commerce’s regulation, 19 C.F.R. § 351.304(c), which addresses the filing of a public version of a business proprietary submission. This regulation requires that public versions of documents containing nonproprietary summaries of proprietary information, or an explanation of why proprietary information cannot be summarized, be filed one business day after the due date of the business proprietary version of the document. 19 C.F.R. § 351.304(c). Although Corticella did not submit a nonproprietary version, Commerce apparently did not reject that company’s data. The reason why a nonproprietary version of Corticella’s data was absent from the record is irrelevant to the narrow issue presented by Commerce’s choice to decline to proceed under alternative (ii). The relevant finding by Commerce is that a nonproprietary version of Corticella’s data was not on the record. Atar’s argument that it was unfairly punished by Corticella’s failure to submit a nonproprietary version of the data is, therefore, unavailing.

3. The Court Cannot Sustain the Department’s Decision to Exclude Sales Outside the Ordinary Course from the Constructed Value ISE and Profit Calculations Under Alternative (iii)

Atar argues that Commerce, when calculating constructed value ISE and constructed value profit under alternative (iii), erred in using a method that excluded the home market sales

of the Final Results 8th Review respondents that were outside the ordinary course of trade.[4] Pl.'s Br. 63-64. Stating that alternative (iii) "does not provide for an exclusion of sales outside of the ordinary course of trade," Atar argues that this exclusion was not reasonable. *Id.* at 64. Defendant argues that Commerce properly excluded the sales that were outside the ordinary course of trade out of a desire to model its methodology upon alternative (ii) and that doing so was within its discretion, under alternative (iii), to use "any other reasonable method." *See* Def.'s Br. 32. Defendant-intervenors argue that Commerce properly excluded such sales out of a desire to simulate the "preferred method" of 19 U.S.C. § 1677b(e)(2)(A). *See* Resp. Br. of Def.-Intervenors Am. Italian Pasta Co., New World Pasta Co., and Dakota Growers Pasta Co. 29, 32 ("Def.-Intervenors' Br.").

An agency generally is required to base a determination on "[a] rational connection between the facts found and the choice made." *Burlington Truck Lines*, 371 U.S. at 168. In addition, the SAA indicates that Commerce, when choosing a method under alternative (iii), must "'provide to interested parties a description of the method chosen and an explanation of

---

[4] The term "ordinary course of trade" is defined in the Tariff Act as:

> the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:
>
> (A) Sales disregarded under section 1677b(b)(1) of this title [which section refers to below-cost sales].
>
> (B) Transactions disregarded under section 1677b(f)(2) of this title [which section refers to certain transactions between affiliated parties].

19 U.S.C. § 1677(15) (2000).

why it was selected.'" *Geum Poong Corp. v. United States*, 26 CIT 322, 323 n.2, 193 F. Supp. 2d 1363, 1365 n.2 (2002) (quoting SAA at 840, *as reprinted in* 1994 U.S.C.C.A.N. at 4176). Accordingly, the court considers the reasoning Commerce put forth in support of its decision to exclude non-ordinary-course sales from the calculation of Atar's constructed value ISE and profit.

The Decision Memorandum explains that "we note that the Department's preference under alternative (B)(iii) is to closely simulate the preferred method[,] which requires that the sales of the foreign like product be in the ordinary course of trade. Therefore, in accordance with the preferred method, we have only included the respondents' above-cost sales in the *Final Results 8th Review*." *Decision Mem.* 22. In using the term "preferred method," the Decision Memorandum refers to the method of § 1677b(e)(2)(A). *Id.* at 19. That method requires Commerce to use in the constructed value calculation the actual selling expenses incurred (such as ISE), and the actual profit realized, on sales of the foreign like product in the foreign market that are made in the ordinary course of trade by the exporter or producer being examined in the review. The Decision Memorandum discloses that Commerce, relying on the "ordinary course" language in 19 U.S.C. § 1677b(e)(2)(A), determined Atar's constructed value ISE and profit by using only those data from the previous (eighth) administrative review that pertained to sales in Italy of foreign like product that were made above cost by the six other respondents in that review. *Id.* at 22. From the Decision Memorandum, the court concludes that the Department's principal rationale for excluding below-cost sales was that it is the Department's general preference to do so.

As applied to constructed value profit, the reasoning Commerce adopted to support its exclusion of below-cost sales in this review has been rejected by the Court of International Trade in *Thai I-Mei Frozen Foods Co., Ltd. v. United States*, 31 CIT ___, ___, 477 F. Supp. 2d 1332, 1357 (2007) (finding inadequate Commerce's explanation that "including only the sales made in the ordinary course of trade is consistent with the Department's preferred methodology of calculating profit" (internal quotation marks and citation omitted)) and *Thai I-Mei II*, 32 CIT at ___, 572 F. Supp. 2d at 1368 (rejecting the Department's conclusion "that it was reasonable for Commerce, when choosing a method under alterative (iii)" for calculating constructed value profit, "to 'mimic' the general preference Commerce found in construing 19 U.S.C. § 1677b(e)(2)(A)"). Under § 1677b(e)(2)(A), Commerce, in determining constructed value, uses the actual selling expenses incurred, and profit realized, on ordinary-course sales of the respondent being reviewed. 19 U.S.C. § 1677b(e)(2)(A). In this case, Atar's own data were not used because Atar lacked a viable home country market for the foreign like product. Consequently, the method Commerce applied under alternative (iii) resulted in Atar's being assigned a margin that was affected by the exclusion of below-cost sales that were made not by Atar but by others. Commerce erred in considering the specific requirements of § 1677b(e)(2)(A), which do not extend to a determination made under § 1677b(e)(2)(B) and to alternative (iii) thereunder, to be relevant to the issue of whether or not below cost sales should be excluded from the calculation of Atar's constructed value ISE and profit under § 1677b(e)(2)(B)(iii). *See Thai I-Mei II*, 32 CIT at ___, 572 F. Supp. 2d at 1364. The court, therefore, rejects defendant-intervenors' argument that Commerce properly excluded the non-ordinary-course sales out of a desire to simulate the "preferred method" of 19 U.S.C.

§ 1677b(e)(2)(A), which argument relies on Commerce's flawed analysis. *See* Def.-Intervenors' Br. 29, 32.

The Decision Memorandum uses language in the Preamble informing the public that "depending on the circumstances and the availability of data, there may be instances in which the Department would consider it necessary to exclude certain home market sales that are outside the ordinary course of trade in order to compute a reasonable measure of profit for [constructed value] under the third alternative method." *Decision Mem.* 22-23; *see also Preamble*, 62 Fed. Reg. at 27,359. Thus, the Preamble informs the public that Commerce does not consider it appropriate to exclude non-ordinary-course sales from all constructed value profit calculations under alternative (iii) but will approach the question on a case-by-case basis. The reference in the Decision Memorandum to the Preamble language is puzzling because in this particular review, Commerce excluded the below-cost sales of other respondents without relating that exclusion to any particular circumstance of Atar's. Commerce apparently considered the situations of the respondents in the eighth review to be sufficiently similar to that of Atar in the ninth review merely because the other respondents were also Italian companies that produced or exported the foreign like product. *See id.* at 22-23. However, the Decision Memorandum states no finding, and no record evidence, from which the court could conclude that the partial sales experience of the six respondents in the preceding review (*i.e.*, the sales experience of those respondents as limited to above-cost sales) was a reasonable approximation of what Atar's home market sales experience would have been had Atar had a viable home market for the foreign like product during the ninth review. In this respect, the exclusion of below-cost sales of the other respondents, as Commerce applied that exclusion to Atar's situation based on the Department's

general "preference" to do so, was arbitrary. A default policy or preference under which Commerce inflexibly excludes below-cost sales in all situations such as the one presented here cannot serve as a substitute for determining a "reasonable method" for purposes of alternative (iii). Such a policy or preference is contrary to the Department's own commitment, as stated in the Preamble, to a case-by-case determination and does not further the principle that Commerce is to calculate an antidumping margin as accurately as possible based on the particular record before it. *See Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994); *Geum Poong I*, 25 CIT at 1098, 163 F. Supp. 2d at 679 (quoting *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995)).

The Decision Memorandum also explains that Commerce excluded the below-cost sales out of a desire to simulate the "preferred method" as that method is reflected in alternative (ii):

> The Department's methodology used in the *Preliminary Results 9th Review* closely simulates alternative (B)(ii) in that it relies on data of sales of the foreign like product in the foreign country in the normal course of trade, the only difference being that the methodology used is based on respondents of the preceding review rather than respondents of the current review. The Department finds that this methodology, a version of alternative (B)(ii), most closely simulates the preferred method in that it focuses on sales of the foreign like product in the foreign country in the ordinary course of trade. For purposes of these final results, we have continued to use the weighted-average ISE and profit derived from the respondents in the immediately preceding administrative review, *Final Results 8th Review*. The Department has determined that this methodology most closely simulates the requirements of alternative (B)(ii) and consequently, the preferred method, in that the weighted-average ISE and profit amounts from the *Final Results 8th Review* represent actual amounts incurred and realized in connection with the production and sale of the foreign like product, in the ordinary course of trade, for consumption in the foreign country.

*Decision Mem.* 20. For two reasons, the court concludes that this rationale is misguided. First, as the Decision Memorandum acknowledges, alternative (ii) was inapplicable because the sales

data of the only other respondent in the review, Corticella, was not suitable for use in the ninth review for the reasons previously discussed. Because alternative (ii) had no applicability in the circumstance of the review, there was no apparent, logical basis for Commerce to draw from the language of alternative (ii) a statutory or departmental preference for the exclusion of below-cost sales that applies whenever Commerce is proceeding under alternative (iii) on facts analogous to those presented here. *See Thai I-Mei II*, 32 CIT at ___, 572 F. Supp. 2d at 1367. Second, the purpose of the exclusion of sales outside the ordinary course under alternative (ii) is to effectuate the general principle that a respondent should not benefit from its own unfair sales in its home market, a consideration not applicable in this case. *See* SAA at 840, *reprinted in* 1994 U.S.C.C.A.N. at 4176. The SAA explains that where Commerce cannot calculate profit for a particular foreign producer under the general rule [*i.e.*, 19 U.S.C. § 1677b(e)(2)(A)] because *all* of that producer's sales were at below-cost prices, that producer, absent the exclusion of below-cost sales in alternative (ii), would benefit from its own unfair pricing because its profit figure would be based on an average of other producers' profitable *and* unprofitable sales. *Id.*; *see Thai I-Mei II*, 32 CIT at ___, 572 F. Supp. 2d at 1366. The court, therefore, rejects defendant's argument that Commerce properly excluded the sales that were outside the ordinary course of trade out of a desire to model its methodology upon alternative (ii). *See* Def.'s Br. 32.

Commerce's error in excluding non-ordinary-course sales affected both the constructed value ISE and the constructed value profit for Atar. In both respects, there is a failure to ground the decision to exclude those sales in findings of fact, supported by substantial record evidence, that are pertinent to Atar's specific situation. With respect to constructed value profit in particular, the failure to provide adequate reasoning for the method chosen under alternative (iii)

also had implications for the profit cap provision within alternative (iii).[5] In the Preliminary Results, Commerce stated that "the weighted-average profit rate of the respondents in the *Pasta Eighth Review Final Results* establishes a profit cap. Thus, the reasonable method used by the Department to calculate profit does not exceed the profit cap." *See Prelim. Results,* 71 Fed. Reg. at 45,022. In the Final Results, Commerce calculated ISE and profit in the same manner as in the Preliminary Results. *Decision Mem.* 19. From the record, it appears that Commerce used the same data set, and the same methodology, to calculate the profit cap that it used to calculate Atar's constructed value profit. The court can only surmise that under the profit cap methodology the Department applied in the review, no constructed value profit calculation could ever exceed the profit cap because the two calculations would be the same. If this surmising is correct, a question arises as to whether such a methodology results in a meaningless profit cap that fails to serve the purposes Congress intended when it included the profit cap limitation within the language of alternative (iii). For these various reasons, the court is not persuaded by defendant's argument that the court must uphold Commerce's method of determining constructed value ISE and profit according to Commerce's broad discretion in selecting "any other reasonable method" pursuant to alternative (iii). *See* Def.'s Br. at 32, 35; 19 U.S.C. § 1677b(e)(2)(B)(iii).

---

[5] In alternative (iii), the statute imposes a general and a specific requirement. The general requirement is that any method that Commerce chooses to use thereunder to determine selling, general, and administrative expenses, and to determine profit, must be a "reasonable method." 19 U.S.C. § 1677b(e)(2)(B)(iii) (2000). The specific requirement is the "profit cap" limitation on Commerce's determination of constructed value profit, which in pertinent part reads, "except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers . . . in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise." *Id.*

Atar makes several other arguments in challenging the reasonableness of the Department's calculation of its constructed value ISE and profit. Atar argues that Commerce's use of the weighted-average data from the Final Results 8th Review was unreasonable in general because these data "bore no reasonable relationship to Atar's Corporate make-up, selling practices, market presence, or business experience" during the ninth period of review. Pl.'s Br. 47. Atar argues that its business operations are dramatically different from those of the six companies on which Commerce relied. *Id.* at 54. According to Atar, the number of customers and invoices, the weight of product per invoice, and the number and weight of observations, are indicators of whether business operations of different companies are similar. *Id.* Atar contends that, because the other companies are not tollers, have different sales quantities of pasta, and require utilization of ISE/profit data from a different period of review, these companies are not sufficiently similar to Atar and therefore do not provide a proper comparison for purposes of determining constructed value. *Id.* Atar also makes the specific argument that Commerce should have relied on the weighted averages of only those respondents from the Final Results 8th Review whose sales practices "more closely resemble the manner in which Atar conducts business." *Id.* 55. According to Atar, only certain of the respondents in the Final Results 8th Review had a similar sales practice as Atar, *i.e.*, a large quantity of sales to a limited customer base. *Id.* Atar argues, additionally, that Commerce should exclude the data pertaining to respondent Barilla G.e.R. Fratelli, S.p.A. (formerly Barilla Alimentare, S.p.A.) ("Barilla") from any analysis. *Id.* at 60. Atar maintains that the home market pasta sales of Barilla differ from Atar's sales to Angola with regard to size, marketing efforts and overall business operations. *Id.*

at 63. Atar further contends that Barilla cannot be a reasonable surrogate for Atar because Barilla's home market sales were at a more advanced level of trade than Atar's sales. *Id.*

Because the court concludes that the methods Commerce used in calculating Atar's constructed value ISE and profit have not been shown to be reasonable on the administrative record, the court need not, and does not, consider these additional objections that Atar raises to Commerce's methods. On remand, Commerce, if it so chooses, may reconsider its previous rejection of these additional objections by Atar. In developing a remand redetermination, Commerce need not include in its analysis the data of all six respondents in the previous review but may select those data that it believes are appropriate to a reasonable method. On remand, however, Commerce *must* reconsider its calculations of constructed value ISE and profit and, specifically, must reconsider its prior decision to exclude the data on below-cost sales. Commerce must submit a remand redetermination in which it demonstrates that the methods it uses to calculate constructed value ISE and profit comply with the reasonableness requirement embodied in 19 U.S.C. § 1677b(e)(2)(B)(iii).

C. Commerce Properly Included Dividends Paid by Atar to Its Shareholder in the Selling, General, and Administrative Expense Calculations

The Department increased Atar's selling, general, and administrative expenses to account for the value of certain services that Atar was provided by its principal, an employee and shareholder in the company who elected to forego compensation for those services. *Decision Mem.* 24-26. The services at issue included pursuing customers and arranging sales transactions. *Id.* at 25. Commerce valued those services, as provided during the 2004 fiscal year, at the amount of dividends that Atar paid to the shareholder during that fiscal year. *Id.* at 26. Atar

claims that Commerce's addition of the surrogate amount was contrary to law. Pl.'s Br. 66-67. Atar argues that the distributions it paid to the shareholder are corporate dividends, not salary, and that in treating the dividends as salary, the Department departed from its long-standing practice without a factual or legal basis. *Id.*; *see also Decision Mem.* 24 (explaining that Atar argued during the review that, because Atar's normal books and records are in accordance with Italian generally accepted accounting principles (GAAP) and reasonably reflect the costs associated with the production of the merchandise, the Department has no authority to determine an alternative salary amount).

In determining a surrogate value for the services in question, Commerce relied on 19 U.S.C. § 1677b(f)(2), which provides that Commerce may disregard a transaction between "affiliated persons," (which term is defined in 19 U.S.C. § 1677(33) (2000)), "if in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2); *see Decision Mem.* 25. If such "a transaction is disregarded . . . and no other transactions are available for consideration," Commerce shall value the cost of an affiliated-party input "based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." 19 U.S.C. § 1677b(f)(2). Under the Department's analysis, the amount of the salary–zero–does not fairly reflect the value of the services the principal provided to the company.

Atar does not contest the Department's conclusion that the employee was an "affiliated person" for purposes of 19 U.S.C. § 1677(33)(E) because the employee owned more than five percent of the equity in Atar. *See* 19 U.S.C. § 1677(33)(E); *Decision Mem.* 25. In addition, the record facts are that the employee provided to Atar the services in question and did not receive a salary. The court concludes that Commerce, on the record before it, acted within its authority in including in its calculations a value for those services the principal provided to Atar. Atar's argument that the addition was improper because it constituted corporate dividends is unconvincing. The dividends were not added to the calculation as dividends; instead the total amount of the dividends in the 2004 fiscal year was used to determine the value of the relevant services that the shareholder performed during that fiscal year, as if the shareholder had been paid a salary for the services. The only remaining issue, therefore, is whether the amount of the dividends served as a reasonable surrogate for that hypothetical salary.

After Commerce raised the issue of valuation of the compensation in a cost verification report, neither Atar nor the petitioners commented on a proper method of valuation. *Decision Mem. 25* (citing *Verification of the Cost Resp. of Atar S.r.l. in the Antidumping Duty Admin. Review of Certain Pasta from Italy* 4 (Nov. 30, 2006) (Confidential Admin. R. Doc. No. 54) ("*Cost Verification Report*")). Atar acknowledges that it was aware of the issue of the value of compensation prior to the issuance of the Final Results but argues that it was unable to comment effectively on Commerce's reasoning because "there was no data of record which could have provided the value" and "[a]s the factual record was closed, Atar could not have provided the new factual information" to enable Commerce to calculate a value. Pl.'s Reply 41. The court disagrees. The agency provided the parties the opportunity to address the issue of how it should

value the services, but Atar, rather than providing information on this issue, took the position that the Department, as a matter of law, could not analyze the compensation paid to the employee, citing the principle that corporate dividends should be excluded from the calculation. *See Atar's Admin. Case Br.* 64; *see also* Def.'s Br. 42 (stating that Atar was on notice of the valuation issues by October 16-20, 2006, the dates when Atar's verification occurred). Atar did not take advantage of its opportunity to propose a method by which Commerce should value compensation for the services. *See Atar's Admin. Case Br.* 63-71.

In determining the value of the transaction as if it had occurred between unaffiliated persons, Commerce looked for data on hourly wage rates in Italy but could not locate such rates on the International Labor Organization's website or via the World Wide web. *Decision Mem.* 25. The Department also concluded that Corticella's data would not suffice because it was not specific to the annual wages paid per person. *Id.* Commerce concluded that the only information available on the record that could reflect the fair market value of the employee's services was the total of the dividend distributions that the employee received from Atar during the 2004 fiscal year. *Id.*

Upon examination of the Decision Memorandum, the court concludes that Commerce has not provided an adequate rationale for its determination that the value of the dividends reasonably represented the value of the relevant services that Atar was provided by its principal. The Department's rationale is essentially that it tried, but failed, to find any data better than the dividends with which to value the services, and that Atar could have, but did not, place any relevant information on the record. This rationale does not suffice because the payments involved unquestionably were dividends, which by definition are amounts determined according

to equity ownership, not services rendered to the company. Because the record fact is that the amount Commerce used to value the services was the amount of the dividends, and because there was no inherent relationship between the value of the dividends and the value of the services, Commerce's rationale does not suffice. That rationale is not grounded in findings of fact, supported by substantial record evidence, that could support the Department's conclusion that its estimate of the value of the services was reasonable.

Nevertheless, the court concludes, after conducting its own examination of the record, that substantial evidence is available on that record to demonstrate the reasonableness of the amount Commerce used to value the services in question. In the Cost of Production and Constructed Value Calculation Adjustments for the Final Results, Commerce concluded that a salary that Atar paid to a certain minority shareholder, who was not a corporate officer, reflected an arm's length transaction between affiliated parties. *See Cost of Production and Constructed Value Calculation Adjustments for the Final Results - Atar S.r.l. ("Atar")* 2-3 (Feb. 5, 2007) (Confidential Admin. R. Doc. No. 58). This report also reveals that the surrogate salary Commerce determined for Atar's principal was not substantially greater than the salary that the company paid to this other shareholder. *Id.* The record contains other information concerning the nature of the positions in the company that were held by these two shareholders and the relative levels of those positions within the organization. *Id.*; *see also Cost Verification Report* 4. From all of this record evidence, the court readily can conclude that the Department's estimate of a hypothetical salary for the majority shareholder was set at a reasonable amount.

## III. CONCLUSION

Commerce lawfully determined that a particular market situation existed with respect to Atar's selling activity in Angola and, therefore, was justified in resorting to constructed value to determine the normal value of Atar's subject merchandise. Substantial record evidence supported Commerce's findings that Atar made a single sale in Angola during the period of review and that the terms and conditions of that sale differed significantly from those of Atar's sales to the United States. Additionally, substantial evidence exists on the record to demonstrate the reasonableness of the amount Commerce used to value certain services that Atar was provided by its principal.

Commerce's decision in the Final Results to calculate Atar's constructed value ISE and profit based on only those sales of respondents in the eighth administrative review that occurred in the ordinary course of trade was not supported by reasoning that allows the court to conclude that Atar's constructed value ISE and profit were determined according to a "reasonable method" as required by 19 U.S.C. § 1677b(e)(2)(B)(iii). The court, therefore, is directing Commerce to reconsider, and redetermine as necessary, these aspects of the Final Results and to submit a remand redetermination conforming with this Opinion and Order.

## ORDER

For the reasons stated in this Opinion and Order, plaintiff's motion for judgment upon the agency record is granted in part and denied in part, and it is hereby

**ORDERED** that the determination set forth and published as the *Notice of Final Results of the Ninth Administrative Review of the Antidumping Duty Order on Certain Pasta from Italy*, 72 Fed. Reg. 7011 (Feb. 14, 2007), is hereby remanded to the United States Department of Commerce ("Commerce") for further proceedings consistent with the requirements of this Opinion and Order; it is further

**ORDERED** that Commerce shall reconsider, and redetermine as necessary, its calculations for Atar of a constructed value indirect selling expense and a constructed value profit and in so doing must reconsider its decision to exclude from those calculations the data derived from home market sales of the respondents in the eighth administrative review that occurred outside the ordinary course of trade; it is further

**ORDERED** that the findings made in the redetermination that Commerce issues upon remand shall be supported by substantial evidence on the record; it is further

**ORDERED** that the redetermination that Commerce issues upon remand shall include an explanation of the reasoning for the choices Commerce makes with respect to constructed value indirect selling expense and constructed value profit; it is further

**ORDERED** that Commerce shall explain why its remand redetermination satisfies the "reasonable method" requirement of 19 U.S.C. § 1677b(e)(2)(B)(iii); and it is further

**ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order to complete and file its remand determination; plaintiff shall have thirty (30) days from the filing of the Remand Redetermination to file comments; and defendant and defendant-intervenors shall have twenty (20) days after plaintiff's comments are filed to file any reply.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: June 5, 2009
New York, New York