# United States Court of Appeals for the Federal Circuit

---

**THAI I-MEI FROZEN FOODS CO., LTD.,**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2009-1516

---

Appeal from the United States Court of International Trade in Case No. 09-CV-0197, Judge Timothy C. Stanceu.

---

Decided: August 12, 2010

---

MICHAEL T. GERSHBERG, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiff-appellee.

FRANKLIN E. WHITE, JR., Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director, and STEPHEN C. TOSINI, Trial Attorney.

---

Before LOURIE, MAYER, and LINN, *Circuit Judges.*

LOURIE, *Circuit Judge.*

The government appeals from the decision of the United States Court of International Trade ("the Trade Court") holding unreasonable the Department of Commerce's ("Commerce's") interpretation of its governing statute and concluding that the constructed value profit rate was not determined according to a reasonable method. *See Thai I-Mei Frozen Foods Co., Ltd v. United States*, 572 F. Supp. 2d 1353 (Ct. Int'l Trade 2008) ("*Thai I-Mei II*"). Because Commerce's first remand determination was in accordance with law, we reverse the Trade Court's decision.

BACKGROUND

Under the antidumping statute, Commerce imposes duties on imported merchandise that "is being, or is likely to be, sold in the United States at less than fair value" and harms domestic industry. 19 U.S.C. § 1673. Sales at less than fair value are those sales for which the "normal value" (the price a producer charges in its home market) exceeds the "export price" (the price of the product in the United States). 19 U.S.C. § 1677(35)(B). If sales of comparable merchandise are not available for the agency to determine normal value, the agency may use a constructed value. 19 U.S.C. § 1677b(e). The statute specifies that constructed value is the sum of (1) the cost of materials and processing used to produce the merchandise in the ordinary course of business, (2) the actual selling, general, and administrative expenses and actual profits realized in production of a foreign like product in the ordinary course of trade, and (3) container costs. *Id.*

The statute further specifies three alternatives for situations where actual data are not available for the selling, general, and administrative expenses and profit amounts. First, Commerce may use actual amounts incurred by the specific exporter or producer for merchandise in the same general category as the subject merchandise (in contrast to use of data for the foreign like product). 19 U.S.C. § 1677b(e)(2)(B)(i).  The second alternative is using the weighted average of actual amounts incurred by other exporters or producers subject to investigation for the foreign like product.   19  U.S.C. § 1677b(e)(2)(B)(ii). The  third  alternative  allows  determination  of  the amounts incurred and realized "based on any other reasonable method . . . ."  19 U.S.C. § 1677b(e)(2)(B)(iii).

In February 2005, Commerce made a determination that shrimp from Thailand were being dumped (*i.e.*, sold at less than fair value) in the United States at a margin of 5.29%.  *Certain Frozen Warmwater Shrimp from Thailand*, 70 Fed. Reg. 5,145 (Feb. 1, 2005) (notice of amended final determination of sales at less than fair value and antidumping duty order), amending ministerial errors in *Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 Fed. Reg. 76,918 (Dec. 23, 2004) (notice of final determination of sales at less than fair value).  In making its determination, Commerce used a constructed value after finding that there was no viable home market for the product.

To determine constructed value for Thai I-Mei, Commerce used profit data from the two other mandatory respondents' third country sales (in Canada), pursuant to 19 U.S.C. § 1677b(e)(2)(B)(iii), excluding data for sales it determined were not made in the ordinary course of trade. Sales outside the ordinary course of trade include below-cost sales and certain transactions between affiliated parties.  *Thai I-Mei Frozen Foods Co., Ltd v. United*

*States*, 477 F. Supp. 2d 1332, 1355 (Ct. Int'l Trade 2007) ("*Thai I-Mei I*"), (citing 19 U.S.C. § 1677(15)). The excluded sales accounted for 20% of the total sales Commerce examined in making its determination; the resulting profit margin calculated was 9.67%. In using these profit data, Commerce rejected Thai I-Mei's submission of data from other Thai companies' sales of seafood in third country markets, and its suggested profit of either 0% or 0.87%.[1]

Thai I-Mei challenged Commerce's determination in the Court of International Trade. The Trade Court found Commerce's decision to use other respondents' third country sales to determine profit for its constructed value calculation instead of the data set proffered by Thai I-Mei to be supported by substantial evidence, under 19 U.S.C. § 1677b(e)(2)(B)(iii). *Thai I-Mei I*, 477 F. Supp. 2d at 1341-48. However, the Trade Court found that Commerce had not adequately explained its exclusion of sales outside the ordinary course of trade in making its profit determination for Thai I-Mei. *Id.* at 1357. The Court of International Trade remanded with instructions to "reconsider this aspect of the Amended Final Determination." *Id.* at 1358.

In its determination following the first remand, Commerce continued to exclude sales outside the course of ordinary trade from the third country sales data of the other respondents in determining profit data for Thai I-

---

[1] Commerce also did not cap the number it used for profit, as required by 19 U.S.C. § 1677b(e)(2)(B)(iii), determining that such a cap could only come from Thai sales of similar category products, and that no market for such products existed in Thailand. However, the court found that Thai I-Mei did not exhaust its administrative remedies on this point and was therefore barred from challenging it. *Thai I-Mei I*, 477 F. Supp. 2d at 1353-54.

Mai.  Commerce noted that the "any other reasonable method" language of the statute did not dictate the inclusion or exclusion of sales outside the ordinary course of trade, and that the preamble to Commerce's regulations requires a finding "depending on the circumstances and availability of data." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,359 (Dep't of Commerce May 19, 1997) ("Preamble").  Commerce also noted that the "preferred" method, *i.e.*, using the methodology of 19 U.S.C. § 1677b(e)(2)(A), requires exclusion of sales outside the ordinary course of trade, and stated that it had "looked to a methodology that mimics the preferred method."  In a footnote, Commerce explained that like subparagraph (B)(iii), subparagraph (B)(i) does not specifically exclude sales outside the ordinary course of trade because that section references sales of merchandise that is merely in the same general category as the subject merchandise rather than sales of the foreign like product. Commerce explained that it would not have sale-specific data for sales of merchandise that were only in the same general category because that merchandise will generally not be subject to the investigation or review.

Commerce then evaluated the "circumstances and availability of data," and noted that because the data were from two other respondents to the investigation, Commerce was able to exclude sales outside the ordinary course of business.  As to the circumstances of the case, Commerce relied on its exclusion of those sales when calculating profit margins for the other two respondents and that all three were exporters of the subject merchandise, in contrast to other "(iii) cases where the merchandise relied upon was same general category merchandise, rather than also subject merchandise."  J.A. 71.  Lastly, Commerce found determinative that the three respondents all made their sales during the same time period.

The Trade Court again remanded, finding Commerce's interpretation of the statute to be unreasonable and its determination upon remand unsupported by substantial evidence. *Thai I-Mei II*, 572 F. Supp. 2d 1353. The court found it unreasonable to import a preference from subsection 1677b(e)(2)(A) to subsection (B), which operates as an alternative when the data necessary to determine a margin under subsection (A) are not available. *Id.* at 1363. Specifically, the court found that the exclusion of sales outside the normal course of trade in subsection 1677b(e)(2)(A) had no bearing on the treatment of such sales under subsection (B) because for subsection (A), "the excluded non-ordinary-course sales are those of the respondent under examination." *Id.* at 1634. The Trade Court also criticized Commerce's interpretation of the statute because reading in a "preference" for excluding non-ordinary-course sales would constrain Commerce to implement this preference in *all* determinations under subsection 1677b(e)(2)(B)(iii). That would be in conflict with Commerce's stated position that in determinations under subsection (iii), "depending on the circumstances and the availability of data, there may be instances in which [Commerce] would consider it necessary to exclude certain home market sales that are outside the ordinary course of trade in order to compute a reasonable measure of profit . . . ." *Id.* (quoting Preamble, 62 Fed. Reg. at 27,359).

The Trade Court next found that Commerce had not offered a satisfactory justification for excluding sales outside the ordinary course of trade from its profit calculations for Thai I-Mei. *Thai I-Mei II*, 572 F. Supp. 2d at 1370. The court was not convinced by Commerce's reasoning that Thai I-Mei's profit calculation should be consistent with that of the other respondents, based on its findings that the companies all produced and exported

subject merchandise during the period of investigation. *Id.* at 1368. Rather, the court noted that the similarities "indicate little more than the basis under which Thai I-Mei and the other two entities served as respondents in the investigation." *Id.* In addition, the court stated that consistency among respondents did not provide a reasonable basis for excluding the sales, because the reasoning "reveals nothing of significance with respect to Thai I-Mei's estimated profit experience." *Id.* at 1369. The court noted that Thai I-Mei's circumstances were likely different from those of the other two respondents, given that its dumping margin was much lower than theirs, even with the use of the higher profit data. *Id.* at 1370.

On the second remand determination and under protest, Commerce included sales outside the ordinary course of trade in calculating Thai I-Mei's profit. Based on the resulting constructed value, Commerce calculated a *de minimis* dumping margin for Thai I-Mei. The Trade Court affirmed the second remand determination. *Thai I-Mei Frozen Foods Co., Ltd v. United States*, 2009 WL 1783640 (Ct. Int'l Trade 2009) ("*Thai I-Mei III*").

The government timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the decision of the Court of International Trade *de novo*, "apply[ing] anew the same standard used by the court, and [we] will uphold Commerce's determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (citation and internal quotation marks omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 477 (1951). The Trade Court must defer to Commerce's reasonable construction of its governing statute where Congress "leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'" *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1361 (Fed. Cir. 2005) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)). In order to effectuate review of the reasonableness of agency action, "[c]ourts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).

I.

The government argues that Commerce's decision to use only sales in the ordinary course of trade for calculating Thai I-Mei's profit was reasonable and that the Trade Court should have affirmed its first remand determination. The government contends that Commerce's determination conforms to the statute because it ties decisions concerning when to include or exclude sales outside the ordinary course of trade to the availability of data.

The government further argues that the preferred method of calculating profit described in 19 U.S.C. § 1677b(e)(2)(A), using the "actual amounts . . . realized by the specific exporter or producer . . . for profits . . . in the ordinary course of trade," is an expression of Congressional preference that profit be based upon sales made in the ordinary course of trade. This method, according to the government, is reasonably preferred because it uses only sales that realize a profit to calculate an average

"profit." This interpretation, the government argues, is further supported by other statutory provisions that compel use of sales made in the ordinary course of trade, such as for calculating normal value, 19 U.S.C. § 1677b(b)(1), and for calculating costs for purposes of calculating a constructed value, 19 U.S.C. § 1677b(e)(1).

In addition, the government argues that its determination is in accordance with the Preamble to Commerce's regulations based on its finding as to the "circumstances and availability of data."

The government contends that the Trade Court substituted its judgment for that of the agency where the statute allows Commerce to use "any . . . reasonable method." The government challenges the court's interpretation that because Congress did not expressly state that below cost sales should be excluded from determinations under subsection (iii), Commerce could not interpret it in a way that incorporated that otherwise preferred methodology.

Lastly, the government argues that the Trade Court inappropriately relied on the Uruguay Round Agreements in its finding. The government argues that analysis of the lawfulness of Commerce's interpretation of the provisions of U.S. law requires reference solely to U.S. law.

Thai I-Mei responds that the Court of International Trade granted deference to Commerce's interpretation, but properly found it not in accordance with law because of Commerce's failure to provide an explanation for its choice of data. Thai I-Mei argues that it is unreasonable to use the same methodology for calculating profits for different respondents under different statutory sections. Specifically, Thai I-Mei argues that section 1677b(e)(2)(B)(iii) only applies when the respondent's "actual amounts" for profit are not available, in contrast

to section 1677b(e)(2)(A). Because these situations are different, Thai I-Mei argues, importing preferences from subsection (A) to subsection (B)(iii) is not reasonable. Instead, Thai I-Mei suggests that the normal practice should be to include all sales in profit calculations under subsection (B)(iii), and that any deviation from that position must have a basis in the specific facts of a given case. Thai I-Mei further argues that the mere availability of data does not provide such a reasoned basis.

Lastly, Thai I-Mei argues that the Court of International Trade did not rely on the WTO Agreement in rejecting Commerce's proffered methodology. Rather, Thai I-Mei argues that the court used the agreement to inform its understanding of the statutory structure and purpose.

## II.

We agree with the government and reverse the Court of International Trade's decision remanding Commerce's first remand determination. Here, we are reviewing Commerce's application of a statute that clearly confers authority on it to use "any other reasonable method" for determining amounts incurred for profits. 19 U.S.C. § 1677b(e)(2)(B)(iii). Thus, we are squarely within the territory of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and the deference it affords an agency's "construction of a statutory scheme it is entrusted to administer." *Id.* at 844.

> The relevant statutory provisions at issue in this case are as follows:

> For purposes of this subtitle, the constructed value of imported merchandise shall be an amount equal to the sum of—

> (1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of business;

> (2)(A) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, *in the ordinary course of trade*, for consumption in the foreign country . . .

19 U.S.C. § 1677b(e)(1), (2)(A) (emphasis added). Subsection (e)(2)(B) provides three alternative types of data for use in determining selling, general, and administrative expenses and profit amounts "if actual data are not available with respect to the amounts described in subparagraph (A)." They provide as follows:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, *in the ordinary course of trade*, for consumption in the foreign country . . . .

> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, *based on any other reasonable method*, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

19 U.S.C. § 1677b(e)(2)(B) (emphases added).

The Trade Court found Commerce's use of subsection (B)(iii), above, to be reasonable, *Thai I-Mei I*, 477 F. Supp. 2d at 1341-48, which neither party challenges here. In addition, neither the government nor Thai I-Mei argues that subsection (B)(iii) specifies either inclusion or exclusion of sales made outside the ordinary course of trade,

although Thai I-Mei argues for a default of inclusion, based on the theory that "where Congress has included specific language in one section of a statute but has omitted it from another, related section of the Act, it is generally presumed that Congress intended the omission." *Ad Hoc Comm. Of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 401 (Fed. Cir. 1994). However, given that subsection (B)(iii) is a catch-all provision allowing "any reasonable method," without limitation as to ordinary-course sales, the cited canon of statutory interpretation is inapplicable. Although Congress specified exclusion of sales outside the ordinary course of trade in subsections (A) and (B)(ii), these specify precise data that will be used. Subsection (B)(iii) is implicated when subsection (A) does not apply, and is not limited to a specific type of data; thus, Congress did not make any further specific requirements regarding sales outside the ordinary course of trade. This level of generality cannot be interpreted to create a presumption that sales outside the ordinary course of trade must be included. Thus, the only question is whether Commerce reasonably concluded that it was appropriate to exclude sales outside the ordinary course of trade, given the available data and circumstances of this investigation. We conclude that it did.

As an initial matter, we do not conclude that the Court of International Trade erred in its reference to the Uruguay Round Agreements, as the government argues. The court used the agreement as context, informing its analysis of the Congressional intent behind the statutory provisions at issue. *Thai I-Mei II*, 572 F. Supp. 2d at 1363. As such, the court was not giving effect to provisions of the Uruguay Round Agreements that were inconsistent with U.S. law, counter to 19 U.S.C. § 3512(a)(1).

Although the government makes various arguments to support its position that a general preference for exclusion of sales outside the ordinary course of trade is reasonable, we review only the bases on which Commerce made its determination. *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based"). Thus, we review Commerce's interpretation of the statute and the agency's Preamble to its regulations as "giv[ing] us the discretion of whether or not to exclude such sales." J.A. 76. This includes Commerce's understanding that it only looks to subsection (B) where data necessary for a determination under subsection (A) are not available, J.A. 69, its further statement that it looked to "a methodology that mimics the preferred method," *id.*, and its analysis of data availability and circumstances in this case. From that view, it appears that Commerce's expression of a "general preference" was merely a reflection that where all appropriate data are available, Commerce will use only sales (of foreign like product, made by the respondent) in the ordinary course of trade for determining constructed profit value. We do not read Commerce's results to dictate a preference for excluding sales outside the ordinary course of trade in all determinations pursuant to subsection (B)(iii). Rather, it is a general statement of the preferred method where data are available and Commerce's general goal of mimicking that preference where they are not.

Commerce's determination that there is a "statutorily preferred method" for calculating profit that excludes sales outside the ordinary course of business reflects the structure of the statute, which dictates use of "actual amounts" realized "for profits . . . in the ordinary course of trade" for sales of the foreign like product where avail-

able.  19 U.S.C. § 1677b(e)(2)(A).  It is only when such data are not available for those amounts that the alternative sections of the statute under subsection (B) are implicated.  Thus, it is reasonable for Commerce to have concluded there was a general statutory preference for sales (of foreign like products) made (by the respondent) in the ordinary course of trade.  In addition, the alternative methods outlined in subsection (B) all "mimic" the methodology of subsection (A) by giving alternatives that attempt to track its requirements.  The Trade Court's discussion suggests that the main difference between subsections (A) and (B) is that subsection (A) uses data from the respondent itself, while (B) allows for data from other respondents.  *Thai I-Mei I*, 572 F. Supp. 2d at 1363.  However, subsection (B) sometimes calls for use of respondent data, where available, as discussed below.

Subsection (B), as indicated, allows for three alternatives.  The first permits use of the "actual amounts . . . realized by the specific exporter or producer being examined . . . for profits" for same general category products as the subject merchandise.  19 U.S.C. § 1677b(e)(2)(B)(i).  This "same general category" section uses data from the respondent, but does not specify that the contemplated sales should be in the ordinary course of trade.

The second alternative recites use of "the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation . . . for profits, in connection with the production and sale of a foreign like product in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(2)(B)(ii).  That section allows for use of data from other correspondents, although limited to like products, and only includes sales made in the ordinary course of trade.

Lastly, the statute directs Commerce to use "any other reasonable method" to determine selling, general, and administrative expenses and profit, leaving to Commerce whether sales outside the ordinary course of trade should be included, *inter alia.* 19 U.S.C. § 1677b(e)(2)(B)(iii). Unlike the first alternative, there is no limitation that data be for the specific exporter or producer, and, unlike the second alternative, there is no limitation that the data relate to foreign like products. Subsection (B) thus varies the necessary inputs depending on availability of data, while following the general structure of subsection (A).

As discussed above, the statute dictates the inclusion only of sales in the ordinary course of trade under both subsection (A) and subsection (B)(ii), both of which reference sales of foreign like products—those of the respondent and of other respondents being examined, respectively. That fact supports the idea that availability of data plays a large role in how Commerce is to make its determination generally and with respect to whether sales outside the ordinary course of trade are excluded. As the agency explained in its first remand results, Commerce may not be able to exclude sales outside the ordinary course in some situations because it is unlikely to have "sale-specific data on merchandise in the same general category . . . because such merchandise is not subject to the investigation or review." J.A. 70. Because of the nature of the data used in this particular subsection (B)(iii) determination, it was possible to exclude sales made outside the ordinary course of trade.

Commerce's methodology also does not contradict its own Preamble to the regulations. The Preamble states that for subsection (B)(iii) determinations, "the automatic exclusion of below-cost sales would be contrary to the statute." Preamble, 62 Fed. Reg. at 27,359. The Pream-

ble further states that "depending on the circumstances and the availability of data, there may be instances in which the Department would consider it necessary to exclude certain home market sales that are outside the ordinary course of trade." *Id.* Because Commerce did not mechanically exclude sales outside the ordinary course of trade, but rather made a specific determination that exclusion of the sales was appropriate in this case, it complied with its stated interpretation in the Preamble.

The available data in this case as well as the circumstances Commerce found to be relevant suffice to show that exclusion of sales outside the ordinary course of trade was reasonable. As discussed above, availability of data plays a large role in how profits are determined under the statute. For example, where foreign like product data exist for the specific respondent, Commerce makes its determination pursuant to subsection (A). However, here, there were no home market data from Thai I-Mei, nor were there any third country data, as there were for the other two respondents. Nonetheless, the third country data that were used for the other two respondents were for like products, and thus the data were sufficiently detailed to enable Commerce to exclude sales outside the ordinary course of trade. In addition to the availability of data, Commerce determined that exclusion of sales outside the ordinary course of trade was appropriate in this case for the purposes of consistency with its determinations for the other two respondents. Although blind copying of the methodology applied to other respondents would not be appropriate, Commerce reasoned that "it is not Thai I-Mei's prices we are disregarding as being below cost, it is the prices of the [other respondents]." J.A. 76. Commerce reasonably chose to use profit data from other respondents, and to calculate profit the same way it had for those other respondents. Although Thai I-Mei argued

that its circumstances were different from those of the other respondents, it is unclear how the inclusion of sales outside the ordinary course of trade would be relevant to any such differences. Constructing values for use in antidumping investigations is by necessity imperfect. Where, as here, it has been undertaken under a reasonable interpretation of the statute and with attention paid to the particular circumstances of the case, we will not disturb the results.

As discussed above, Commerce's statement of a general preference for exclusion of sales outside the ordinary course of trade where, as here, the data are for like products sold by other respondents, is reasonable. Commerce reasonably determined that in this case, where such data were readily available, and indeed, had been used for the other two respondents, it was reasonable to make its determination excluding sales outside the ordinary course of trade.

CONCLUSION

For the foregoing reasons, we reverse the Court of International Trade's decision reversing and remanding Commerce's reasonable interpretation of the statute and remand for further action consistent with this opinion.

**REVERSED AND REMANDED**